[No. 19839.   Department One.   June 5, 1926.]

# I. B. Walters, *Appellant,* v. Mason County Logging Company, *Respondent.*[1]

[1] Negligence (3, 38)—Fires—Evidence—Sufficiency.  Where the evidence shows conclusively that the defendant made all reasonable efforts to prevent the spreading of a fire originating on his premises without his fault, as required by Rem. Comp. Stat., § 5647, and was not guilty of any negligence, and that plaintiff's loss was due to the intervening cause of a heavy and violent wind, judgment is properly given to the defendant notwithstanding a verdict in favor of plaintiff.

Appeal from a judgment of the superior court for Mason county, Wright, J., entered October 10, 1925, in favor of the defendant notwithstanding the verdict of a jury rendered in favor of the plaintiff, in an action in tort.  Affirmed.

*Shorett, McLaren & Shorett, Edward R. Taylor* and *Fred G. Clarke,* for appellant.

*Chas. F. Munday* and *Chas. R. Lewis,* for respondent.

Holcomb, J.—On Monday, July 7, 1924, a fire was discovered on land owned by respondent, about five miles from Shelton, at a place where logging operations had been carried on, but had been abandoned by respondent about June 4, 1924.  At the time the fire was discovered, it had not covered more than an acre or so in extent.  There were no officers or employees of respondent at or about the place where the fire started, and the superintendent of respondent was not in the locality or the county where the fire started until July 9, 1924, at which time he was notified by a deputy fire warden.

[1]Reported in 246 Pac. 749.

Respondent had been logging some distance west of the place where the fire started, and had a large quantity of bucked and fallen trees on the land where it had been logging, after the abandonment of the former logging operations. There was no evidence, or attempt to prove, that respondent was in any manner responsible for the origin of the fire.

The fire warden who discovered the fire on July 7th notified Thornton, his superior officer, who put men at work fighting the fire at once. These men, including the man who was put in charge of the crew, were first put to work fighting the fire and worked eight hours the first day, and, thereafter, worked as much as eighteen hours a day on the west and south of the fire.

When the superintendent of respondent was notified, upon his return on July 9th, he secured five men and went out to the fire on the west side. The west side of the fire was where respondent had its bucked and fallen timber amounting to about four million feet. Upon the superintendent's starting to fight the fire on the west side thereof, the fire warden moved his men over to the east side, leaving respondent's superintendent and his men to work on the west side. During the week, until Saturday 19th, men under the fire warden worked on the east side, and appellant and six men worked a large part of the time, and, on Saturday, appellant had fourteen men who also worked on the east side. There were, in all, from twenty-five to thirty-three men fighting the fire on the east side.

When the fire was first discovered, on Monday the 7th, it was about a mile and a half away from the spar tree on appellant's logging works, where his trucks and logs subsequently burned. The spar tree on appellant's logging works was where the donkey engine was stationed for the purpose of hauling in the logs from

the land on which he was operating. A portion of the fire fighters was under the direction, generally, of the fire warden, and also of a representative of the Washington Fire Association, who cooperated to fight forest fires in Mason county.

During part of the time, after the fire started, the wind was rather high, as, for instance, on the 9th, and several witnesses testified without contradiction that, on Sunday morning, the wind sprang up and blew very hard,—hard enough to blow burning particles one thousand feet away and onto a hill about seventy-five feet high, in close proximity to appellant's spar tree, donkey engine, logs and trucks.

The fire warden secured all the available men, between the 8th and 13th of July, to fight the fire, and had left orders in Shelton, the nearest place where men could be employed, for additional men, but was not able to obtain any more than those procured.

On Saturday afternoon or evening, the fire was apparently under control, appellant himself discharging his men, and telling them that the fire seemed to be under control. On Sunday morning, the fire was still half a mile from respondents spar tree. The superintendent of respondent's logging works had gotten control of the fire on the west side of the burning tract, so that none of respondent's property was destroyed. On Sunday, appellant moved one of his trucks to his spar tree and rigged a pump to the truck engine, thinking that he could control what little fire there then was with the pump. The uncontradicted testimony shows that the wind quickly became much stronger, and, in a very short time, the fire had gained such headway that it was impossible to stop it. Men could not work near it. In a few hours, it covered a distance half as great as it had previously covered in six days. When it

started up thus violently on Sunday, it swept into appellant's works, around his spar tree from the south and east, and destroyed his logs, donkey engine and trucks.

Witnesses for appellant testified that they did not see any men employed by respondent fighting the fire, until Saturday afternoon. The uncontradicted evidence of the fire wardens, however, is, that they had the number of men previously mentioned fighting the fire from the time they started in to fight it until Saturday night, or Sunday morning, about two o'clock. The fire warden and the representative of the Washington Fire Association testified that, after the wind started blowing up the draw so violently on Sunday forenoon, it was utterly impossible then to stop the fire.

On trial to the court and a jury the jury returned a verdict in favor of appellant in the sum of $6,537.

On motion for judgment notwithstanding the verdict, or for a new trial, the trial court granted judgment n. o. v., and dismissed the action.

[1] On appeal, appellant very earnestly contends that there was sufficient evidence, or reasonable inferences to be derived from the evidence in the case, to sustain the verdict in favor of appellant against respondent.

Many of our cases are cited and quoted by appellant, stating the well established rule that judgments *non obstante veredicto* can be granted, only when there is neither evidence nor reasonable inference from evidence, upon which the verdict can rest.

Appellant also insists that, while the evidence was conflicting, it was the province of the jury to say on which side the truth lay, a province with which an appellate court has not the right to interfere.

Respondent does not question the soundness of the rules above stated, but asserts that there is practically

no conflicting evidence in the case, and that two things were conclusively established by undisputed evidence: (1) that respondent was guilty of no negligence, and (2) that there was an intervening cause, to-wit, the high and violent wind which carried the fire into the logging works of appellant, against which no human efforts could have prevailed.

To sustain his contention appellant cites and relies upon some of our fire cases, for example: *Northwestern Mutual Fire Association v. Northern Pacific R. Co.*, 68 Wash. 292, 123 Pac. 468, Ann. Cas. 1913E 968; *Jordan v. Spokane, Portland & Seattle R. Co.*, 109 Wash. 476, 186 Pac. 875, and *McInnis v. Squires*, 136 Wash. 10, 238 Pac. 925.

Of all the cases cited by appellant, that which most nearly supports his contention is the last one, in which the writer did not concur. In that case, there were nothing but circumstances, inferences and deductions to be derived from other facts, to sustain the right of recovery for a fire, alleged to have been caused by plumbers in their operations to thaw water pipes, in which it was alleged that the thawing was negligently done, resulting in the fire which destroyed the property. There was no evidence in the case as to what the plumbers used for the purpose of thawing the pipes. After they left, and between 7 and 8 o'clock in the evening, the fire was discovered under the kitchen and around the water pipes. The tenant procured a hose and, so far as he was able to tell, succeeded in extinguishing the fire. Later in the night, the fire was discovered to be raging which destroyed the property. In that case, it was held that there was enough evidence to allow the case to go to the jury. It was also said:

"There was proof that the fire started from the place where the respondents had worked. There was proof

that a fire had, a few hours earlier, started in shavings and sawdust around the pipes which respondents thawed. From this, there is a legitimate inference that the heat used by respondents in their work came from the application of fire to the pipes. The proof of the negligence in such use arises from the fact that a fire was discovered, which was thought to have been extinguished, which must have resulted from the respondents' acts, and the thawing of pipes, ordinarily and *carefully done, is not accompanied by the ignition of* the adjacent building. To submit the appellant's case to the jury would not be allowing it to return a verdict upon conjecture and suspicion."

Appellant asserts that there is a similitude between this case and that, in another respect, in that, in that case, the tenant of the property believed that he had completely quenched the fire in the early part of the evening, but this court held that the jury, under the testimony, had a right to say that he was mistaken in his belief. Appellant insists here that, although he believed, on Saturday night late, that the fire was in a safe condition, under the testimony the jury had a right to say that he was mistaken in his belief.

The *Jordan* case, *supra,* was one where a railroad company allowed a fire to spread from its right-of-way upon the plaintiff's premises, the employees of the railway company knowing of the existence of the fire, having extinguished a fire at the same place, on the opposite side of the railway embankment, and making no attempt to extinguish the fire on the side of the embankment next to plaintiff's premises, which showed two things: knowledge of the existence of the fire, and, under the conditions shown to be existing at that time, its liability to spread to the premises of plaintiff; and actual neglect, on the part of the employees of the railroad, to do anything to prevent the spread of the fire to the premises of plaintiff.

The *Northwestern Mutual Fire Association* case, *supra,* was one where the origin of the fire was questioned, and this court held that it was not necessary for plaintiff to prove, by direct evidence, that the fire was started by one of the defendant's engines, but that the circumstances proven by plaintiff were sufficient to constitute a *prima facie* case of negligence.

In the present case, the origin of the fire was known to be upon respondent's premises. The duty of respondent, after notice of the fire burning upon its property, was the same as if the fire had been set out by respondent itself. In other words, its duty, under the law announced in the *Jordan* case, *supra,* was to use all reasonable efforts to prevent the spread of the fire to the property of others. That is, also, a statutory duty. Rem. Comp. Stat., § 5647 [P. C. § 9131-41]; *Burnett v. Newcomb,* 126 Wash. 192, 217 Pac. 1017.

The only question of negligence, in this case, is as to whether respondent used such efforts and took such care, to prevent the fire from spreading and doing damage to other persons' property, as a prudent and careful man would have done.

Under all the evidence in the case, respondent, the fire wardens, and even appellant himself, used every possible effort and every available man to suppress the fire. They all, apparently, agreed on Saturday night, after the fire was discovered, that it was under control. It is true, that it had then burned about a mile from where it originated, showing that it spread very rapidly. The evidence shows, however, that it was, what was called, a triangular fire, spreading in three directions, more than in other directions. The fire fighting was done under the direction of the fire wardens and the representative of the Washington Fire Association. The fact that the men employed by re-

spondent to fight the fire, were concentrated between the fire and the fallen logs of respondent, and that the property of respondent was saved, while that of appellant was burned, is not of itself a circumstance from which negligence can be inferred. It was necessary for respondent to use the men fighting the fire moving towards its property, because the fire wardens were using all the other men available on the other side, and appellant and his men worked on the same side as the fire wardens, the last day or so that the fire raged.

The evidence is simply irresistible that all of the parties, and all of the men, did everything possible to extinguish, or suppress, the spread of the fire, from the time it was discovered, until it finally resulted in the sudden destruction of appellant's property.

Disregarding the question of whether there was an intervening cause, by reason of the high wind that appears to have been blowing on Sunday forenoon, we are of the opinion that, on the question of negligence, this case falls within the rule of *Lehman v. Maryott & Spencer Logging Co.,* 108 Wash. 319, 184 Pac. 323, and *Stephens v. Mutual Lumber Co.,* 103 Wash. 1, 173 Pac. 1031.

The judgment is therefore affirmed.

TOLMAN, C. J., ASKREN, and BRIDGES, JJ., concur.

FULLERTON, J., concurs in the result.