[No. 20446. Department Two. August 3, 1927.]

JOSEPHINE MENSIK, *Individually and as Administratrix of the Estate of Frank J. Mensik Deceased, Respondent,* v. CASCADE TIMBER COMPANY, *Appellant.*[1]

[1] NEGLIGENCE (3, 40)—FIRES—LIABILITY—QUESTION FOR JURY. Negligence in a logger's burning of his slashings under a permit issued therefor is a question for the jury, where the fire was started at the end of an unusually long dry summer, the ground thickly covered with debris from logging operations, and there was failure to cut down the dead snags within the area burned, and conflicting evidence as to his failure to guard the slashing fires; and in such case, the doctrine of non-liability because of an unexpected and unusual high wind as the intervening cause over which defendant had no control has but little application.

[2] SAME (3, 15, 43)—FIRES—INTERVENING CAUSE—INSTRUCTIONS. In an action for negligence in starting slashing fires, required by law in logging operations, it is proper to instruct that, in starting such fires, one should take into consideration and anticipate the ordinary and usual forces of nature which an ordinarily careful person would consider, and that defendant would not be liable for damages caused by a strong wind which reasonably should not have been forseen as probable to occur.

[1]Reported in 258 Pac. 323.

[3] APPEAL (460)—REVIEW—HARMLESS ERROR—INSTRUCTIONS. In an action for negligence in starting slashing fires, an instruction on the subject of contributory negligence referring to but one of the plaintiffs could not have misled the jury.

[4] NEGLIGENCE (44)—FIRES—CONTRIBUTORY NEGLIGENCE — INSTRUCTIONS. In an action for negligence in starting slashing fires, an instruction on the subject of contributory negligence properly imposes upon the plaintiff the duty to take such care as a careful and prudent man would do.

[5] WITNESSES (122) — IMPEACHMENT — INCONSISTENT STATEMENTS. Where, upon cross-examination of a "party" witness for the defendant in control of defendant's business, he denied making a specific admission against the interest of his employer, it is proper on rebuttal to call attention to the exact conversation and contradict the witness's version.

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered June 12, 1926, upon the verdict of a jury rendered in favor of the plaintiff, in an action in tort. Affirmed.

*Hayden, Langhorne & Metzger,* for appellant.

*E. K. Murray, Leo Teats* and *Ralph Teats,* for respondent.

HOLCOMB, J.—Respondent, individually and as representative of her deceased husband, had judgment upon a verdict in her favor in the lower court in the sum of $1,203.75 in an action for damages against appellant, based upon the alleged negligence of appellant, from the spread of fires set by appellant to burn its logging slashings.

The complaint prayed damages in the sum of $1,573.75 for the destruction ·of a barn, of which the value was alleged to be $750, hay of the alleged value of $660, tools of the alleged value of $43.75, and four calves of the alleged value of $120. There was evidence before the jury to the effect that the barn was worth $600 or $700, and respondent herself testified that the four calves were allowed to run at large, before and during the progress of the fire, upon the lands logged

off by appellant.  Three of the calves were not even found, but were presumed to be destroyed by the fire, since one of the calves came home with its body so severely burned that it died.  The jury, in making its award, evidently deducted $370 from the claims of respondent, which probably represented a deduction of $250 for the barn and hay, and $120 for the calves, which covers one of the contentions of appellant, as to any recovery for the calves.

Appellant made timely, but unsuccessful, motions for a directed verdict, for judgment *non obstante veredicto,* and for a new trial.

Eleven errors are assigned by appellant, all but one of which are argued under one group, viz:

(1)  The cause of plaintiff's loss is entirely speculative.

(2)  Plaintiff's loss was not proximately caused by any negligence of appellant.

(3)  Plaintiff's loss was occasioned solely by the contributory negligence of herself and her now deceased husband.

There is such complete discordance between counsel for the parties, and counsel for appellant contends so strenuously that the cause of respondent's loss is purely speculative, so far as the evidence in the case shows, that we have found it necessary to make a somewhat careful study of the 600-page statement of facts and the exhibits, rather than rely upon the abstract and the interpretation of counsel as to the facts.

The version of the facts by counsel for appellant is most generally based upon evidence introduced by it to the court and jury.  As to a great deal of it, there is a square conflict by controverting evidence.  In order to properly dispose of the case, it is necessary to make a dependable and somewhat detailed statement of the facts.

The spring and summer of 1924 were unusually dry, the record showing the longest and driest season in western Washington in the history of the United States Weather Bureau. During the spring and summer of 1924, and prior thereto, appellant had been engaged in logging operations upon portions of six sections of land, two miles east of Alder, in Pierce county, in a region of very precipitous hills and narrow valleys. The logging had been carried on from two camps, situated about two miles apart; camp 2 being close to the land of respondent. At the time of the fire, camp 2 was closed down.

On September 18, 1924, appellant, through its superintendent Walker, obtained a permit from the state division of forestry to burn the forest debris upon five sections of land which had been logged off. At the same time, some kind of advice was given appellant's superintendent to do the burning quickly, as there would be rain in twenty-four hours. September 18 was on Thursday. On that day, early in the morning, appellant's men started the fires in slashings around camp 1. They had difficulty in getting the fires to start, apparently, as the humidity was high. Finally, the fires did begin to burn, and about noon, the superintendent took part of his crew to camp 2 and started fires in the slashings to the south and west of that camp. Shortly after starting the fires at camp 2, a forest ranger gave the superintendent the official written permit, but gave no directions of any kind as to any further precautions to be taken by appellant.

The fire thus started at camp 2 on Thursday afternoon burned, that day, wholly in the slashings around the camp and worked its way to the east end of a tract of green timber. During Friday, it burned still farther to the east and a little way into the green timber, but elsewhere was confined wholly to the slashings. Dur-

ing Saturday, September 20, the fire began to work to the south and into cedar timber, in a certain section owned by the Weyerhaeuser Timber Company, whose timber being thus threatened, orders were issued by the representative of that company to the superintendent of appellant to cut the snags along that front and put a fire trail around it. During Sunday, September 21, the fire continued to increase in extent and violence, and, about four o'clock Monday morning, had reached the land of respondent along the south and east. Walker, the superintendent, testified that the fire reached respondent's place between 2 A. M. and 3 A. M. on Monday. Other witnesses testified that it was all around the place by 8 A. M. Respondent herself testified that the snags on a hill south of their house were discovered burning by herself and husband, who was then living, at about four o'clock Monday morning.

On Friday, September 19, respondent's husband obtained a permit to burn ten acres of forest debris on his land, and immediately set fire to six or seven piles of debris, as his wife testified, while nine or ten was testified to by a neighbor who assisted him; but the testimony of respondent all shows that those piles were not very big and took very little time to burn down. The neighbor who assisted the husband of respondent to burn the piles said that, by Monday, they had practically completely ceased to burn and "showed only little marks on the ground." Respondent herself testified that, by Sunday afternoon, there was practically no fire remaining in those piles. It is true, they testified that they guarded the fires, to keep them from getting to some other debris and brush along the side of their premises and to keep them from reaching or crossing the logging railroad of appellant.

Appellant makes much of some supposed evidence

by respondent to the effect that, early on Monday morning, the smoke, ashes and cinders from *their* fires were blowing into her house and into every building and crack in it. It is true, she did, in answer to questions by counsel, allude to the fires burning on their land Monday morning as *their* fires. She said she, her husband, their neighbor and their two children were all fighting fires on Monday morning; but, before and later, she said in her evidence that it was all the company's fire that they and the company's men were fighting; that her husband had no fire there at that time. The neighbor also testified that he was continually putting out fires which originated from sparks blowing from tall snags on the hill on the outside of respondent's place. He testified that he must have put out about fifty such fires up to about one o'clock, when he spent about five minutes eating his lunch.

The barn and hay caught fire and were burned between one and two o'clock on Monday afternoon. Appellant had had men there and at an adjoining place, belonging to one Marek, during the forenoon, with a locomotive, hose and water, fighting fires that started upon those places, but only had its men at respondent's place about half an hour between 9:30 and ten o'clock in the morning, when they and the apparatus were withdrawn from that place. When the barn and hay caught fire, they went back, when notified, and saved the other building from burning. Appellant states:

"Literally the barn was between two fires. Immediately to the west of it, and threatening it as well as plaintiff's other buildings, all that Monday morning was plaintiff's own fire burning on some ten acres of logged off, but uncleared land, similar to that where the fire from the defendant's slashings was then burning. Across the clearing, beyond the defendant's main line railroad track on the hill to the east and southwest was defendant's fire."

As was shown by the foregoing summary of the evidence, this assumption by appellant is not borne out by the record. Although repetitive, we re-state that the evidence of respondent is that her husband's fire was not burning on that Monday morning, and there never was at any time any fire burning on the ten acres of their cleared land, except the several piles burned; and there is evidence to the effect that sparks were flying upon respondent's premises from the snags around the place on the west and south. There is also evidence that there were a considerable number of snags left on the logged off land around camp 2 of appellant, the height of them ranging from two feet up to seventy-five feet, and even one hundred fifty feet. The evidence is, that such snags are very dangerous when burning slashings, as they send sparks off for long distances, especially cedar snags. No snags had been cut down between camp 2 and the property of respondent and no fire trails had been constructed.

The wind was from the south, or east of south. Although the records of the United States weather offices at Tacoma and Seattle, both some distance away, showed high wind velocities on Sunday afternoon,— thirty-nine miles per hour at Tacoma at 12:54 p. m., and forty-four miles at Seattle at 3:18 p. m.,—for five-minute periods in each case, there is positive evidence of witnesses, some of whom were apparently disinterested, among others the Headworks weather observer in that vicinity, to the effect that winds of the kind and velocity which actually did blow at the place during the time of the fire were such as were ordinary and frequent at that time of year, and to be expected. One witness was very positive and stated that he wanted the jury "to believe that that fire traveled six miles, with nothing but an ordinary wind to drive it." There is also testimony, which accords with common knowl-

edge, that fires themselves create a wind which increases as the fires increase; and that hills and draws act much the same as smoke stacks, giving draft to the fire and velocity to the wind. The weather record also shows that the wind velocities on Monday were considerably less than on Sunday.

Appellant also asserts that, while the barn of respondent was burning, sparks from it were carried to the east and fell around the appellant's oil tank and around Marek's barn, which caught on fire from them. The inference is derived from this that the sparks from the burning barn were in a direct line from that portion of respondent's property where their own fires were burning. On the contrary, the evidence shows that their own fires were not burning when their barn caught fire, and that Marek's barn caught fire an hour and a half or two hours before respondent's barn caught fire, and the fire on Marek's barn was quickly put out by appellant's crew.

[1] From the foregoing statement of the facts, it is obvious that there was ample evidence upon which the jury could find that the fire that destroyed respondent's property originated in the fire set by appellant in its slashings and from snags which it had allowed to stand in its slashings and near respondent's land. It was thus not purely speculation and conjecture as to what caused the fire.

Appellant also contends that an intervening cause, over which it had no control, namely, a high, unusual and unexpected wind, accompanied by high temperature and great dryness instead of high humidity of the air, after the fires were set in its slashings, caused the spreading of the fire. This, it says, brings the case within the rule announced by this court in *Stephens v. Mutual Lumber Co.*, 103 Wash. 1, 173 Pac. 1031, *Lehman v. Maryott & Spencer Logging Co.*, 108 Wash.

319, 184 Pac. 323, and *Walters v. Mason County Logging Co.,* 139 Wash. 265, 246 Pac. 749.

We do not consider those cases as having very much similarity to this case. As was said of them in *Galbraith v. Wheeler-Osgood Co.,* 123 Wash. 229, 212 Pac. 174:

"The principle of law announced in the cases is that liability for losses caused by the escape of fire lawfully set upon one's own premises must rest in negligence— that the fact alone that the fire escaped is not sufficient to charge the person setting out the fire with liability for losses to others, but that it must be shown that there was not an exercise of due care and prudence, such as the ordinarily prudent person exercises under like circumstances; and on the question of fact involved, it was held in both cases that there was therein no evidence on which to base a finding of negligence."

In the *Walters* case, *supra,* we found that there was absolutely no evidence of negligence on the part of the defendant, but every evidence of the utmost care and caution to prevent the spread of the fire and to protect the property of plaintiff.

In *Wood & Iverson v. Northwest Lumber Co.,* 138 Wash. 203, 244 Pac. 712, we held that it was negligence to fail to cut snags twenty-five feet or more in height, as required by Rem. Comp. Stat., § 5789 [P. C. § 2566], before burning slashings, which, together with the failure to provide proper guards to prevent the spread of the fire, was the proximate cause of a neighbor's loss.

In that case also, it was contended that it was discretionary on the part of the logger to cut or not to cut the snags more than twenty-five feet in height within the area to be burned. We held that it was not.

In this case, it is further contended by appellant that the snags in the logged off portion of the area next to the land of respondent did not need to be cut, because

that was not an area which appellant intended to burn when it started to burn slashings.

Appellant obtained a permit to burn the debris on that portion of its land. It set out the fires around camp 2. The logged off portion of the land in question had never been burned. From all these facts, it must be presumed that appellant did intend to burn all the logged off areas on the land for which it obtained permits.

Appellant devotes a very lengthy and vigorous argument to the contention that respondent's loss was not proximately caused by any negligence of the appellant. It bases its contention upon the three-fold allegations of negligence made by respondent:

1. The starting of a slashing fire after an unusually long dry summer, when the ground was thickly covered with the debris resulting from logging operations;

2. The failure to cut down the dead snags within the area to be burned;

3. The failure to guard the slashing fires, thus permitting them to spread.

It is true that the slashings were the natural, inevitable result of logging operations, and that the statute of this state declares them to be a nuisance and in mandatory terms requires that such nuisance be abated. (Rem. Comp. Stat., § 5807) [P. C. § 2582.] It is also true, that the only practical or feasible manner of abating such nuisances is by burning. If left unburned, and a fire gets into them and spreads to adjoining property, the logger is liable because of the nuisance he has created. It is asserted that appellant's operations had been carefully planned so as to afford a maximum of protection; that a fire barrier, partially natural and partially artificial, completely encircled the camp 2 slashings which it was desired to

burn. It is then asserted that the time chosen seemed propitious; that the dry season had broken. It is claimed that the subsequent escape of the fire from the slashings of appellant and its rapid and uncontrollable spread ten miles or more to the north was due wholly and solely to the intervening of unusual, abnormal, unanticipated and unprecedented combinations of natural causes, such as have been previously adverted to.

The above assertions are controverted by the facts that appellant had not cut the snags in the area to be burned and had not constructed a fire trail between the slashings on its land and respondent's property so as to reasonably protect it. Nor was there any gale which suddenly sprang up, such as was the case in the *Stephens* case, *supra*, largely relied upon by appellant, where the wind changed and blew from an exactly opposite direction very suddenly, and blew very violently. The same was true in the *Lehman* case, *supra*.

Appellant also claims that, in this case, it is shown that the wind changed in its direction and that the shifting of the wind caused the shift in the spread of the fire. There is evidence that the wind blew generally from the same direction at all times, except that it varied and veered slightly at times, but to no great extent.

As to negligence in failing to guard the fires, the statute above cited imposes the duty upon one starting a fire, even for a lawful purpose, to "take such care of it to prevent it from spreading and doing damage to other persons' property as a prudent and careful man would do." The evidence shows that, on Friday morning, the fire front of the fire at camp 2 was over three miles in breadth, and, on Saturday evening, was between six and seven miles in breadth, even though, according to the evidence of appellant's

own engineer, the wind did not amount to much. The rapid progress of the fire after it got started, with the prevalence of only the ordinary or usual winds of that vicinity, shows of itself that the slashings were exceedingly dry and inflammable. Therefore, it was a question of fact for the jury, from all the evidence before it as to the conditions there existing, as to whether ordinary prudence to prevent the fire from spreading and doing damage to other persons' property did not require the construction of fire trails and the felling of dead snags within the area that the fire was likely to traverse, adjacent to and near respondent's land.

In fact, all of the foregoing propositions were properly submitted to the jury for decision upon the facts produced in this case. *McInnis v. Squires,* 136 Wash. 10, 238 Pac. 925.

[2] Appellant next complains of instructions numbered 13 and 14 given by the court. They are as follows:

"No. 13—In logging operations, and in the clearing of new land, it is necessary to build fires, and to destroy waste. The law of this state requires loggers and logging companies to burn their slashings, and holds them liable for their failure to do so. This cannot be done without a certain hazard to other property, but the law does not for that reason deny the right to maintain fires in the prosecution of the legitimate business, nor will it charge one with negligence who fails to put out a fire which is not threatening, when such fire by reason of some new cause lodges on the property of another, or goes beyond the control of a person who set it out. The rule in the cases of this kind is that one starting a fire on his own lands *should take into consideration and anticipate the ordinary and usual forces of nature at the time and place and under existing circumstances which an ordinarily careful and prudent person would consider and anticipate,* and is required to exercise reasonable care to prevent it from spreading to a neighbor's land. If in

this regard he acts as a reasonably prudent person would have acted under like or similar circumstances, he is not guilty of negligence. On the other hand, if he fails so to act, he has not exercised that degree of care which the law requires of him, and would be chargeable with negligence. But if, notwithstanding such negligence, a new cause intervenes which *reasonably should not have been expected or foreseen as probable to occur and which* of itself is sufficient to stand as the cause of the misfortune, the first act is considered too remote to sustain a recovery. In this connection I charge you that a strong wind which, *in the exercise of ordinary care and prudence could not have been anticipated,* arises while a fire is in progress and carries it where it would not otherwise have spread, is an intervening cause which will relieve the party responsible for the original fire from liability for loss occasioned thereby.''

''No. 14—You are instructed that it was the duty of the defendant to exercise that care and diligence which a person of ordinary prudence would exercise to extinguish or control any fire started by it upon its premises, and to protect the property of the plaintiff against loss on account thereof, in view of the nature and extent of the fire, the material on the ground, the weather conditions prevailing, the means at hand, and all the surrounding circumstances, and the failure of the defendant to exercise such reasonable care would be, and constitutes, negligence upon its part. But even though you should find from a fair preponderance of the evidence, that the defendant was negligent either in starting the fire or in the precautions which it took to prevent the spread thereof thereafter, your verdict cannot be for the plaintiff, unless you further find that her loss was the proximate result of such negligence. Accordingly, if you also find that, subsequently to the defendant's negligence, a strong wind *which reasonably should not have been foreseen as probable to occur,* arose which carried the fire where it would not otherwise have spread, and thus caused the plaintiff's damage, or created a situation such that the defendant could not, by the exercise of ordinary prudence, have

avoided the damage, then the defendant's negligence is not the proximate cause of the plaintiff's loss, and your verdict must be for the defendant.''

The portions italicized are criticized by appellant as engrafting a new principle on the law of intervening cause adopted by this court in the *Stephens* and *Lehman* cases, *supra,* and imposing a much more onerous duty and vastly larger responsibility upon the logger.

Again, we point out that the evidence as to intervening cause in this case was conflicting. In the *Stephens* and *Lehman* cases, *supra,* we held that there was no evidence whatever to contradict the showing that there was an intervening cause by reason of a sudden change and the violence of the wind, which as a matter of law was wholly responsible for the damages. The instructions given here are in accord with the decisions in the *Stephens* and *Lehman* cases, the statute in regard to the logger's duty, and our decisions in *Burnett v. Newcomb,* 126 Wash. 192, 217 Pac. 1017, and the *Wood & Iverson* case, *supra.*

[3] Complaint is also made of another instruction, numbered 15, because it limited contributory negligence on the part of respondent to that of respondent herself, instead of the acts of herself and her then living husband. We consider this complaint too technical to be tenable. The jury could not have been misled by the phrase in the instruction, ''unless you find that plaintiff was herself guilty of contributory negligence.''

[4] It is also claimed that this instruction imposed upon appellant an unlimited duty to guard its fires, irrespective of whether or not the spread was due to an intervening cause. But the instruction also charges that the duty is imposed upon appellant to take such care as a careful and prudent man would do. That is the exact requirement of the statute (§ 5789, *supra*)

and therefore can not be successfully assailed. See, also, *Sandberg v. Cavanaugh Timber Co.*, 95 Wash. 556, 164 Pac. 200.

[5] Complaint is also made of the allowance by the trial court of respondent to testify on rebuttal that she heard Walker, appellant's superintendent, say to her and her husband, "If we cannot save you, we will back you up," over appellant's objection that it was incompetent and an attempt to impeach a witness upon a collateral matter brought out on cross-examination.

Walker was the principal representative of appellant on the ground and as a witness at the trial. As such, he was in a sense a party witness. On his direct examination, he testified as to a visit to respondent's place on Monday morning, when they were chopping some green trees and piling them up, and stated what they told him they were doing it for and what he said to them. On cross-examination by respondent's counsel, the following occurred:

"Q. What was it you said to Frank about those trees he was cutting down? A. Told him he could not cut those trees, because it would make more fire. Q. There was fire pretty well around him then, wasn't there? A. Yes. Q. Did you make any remark to him about those fires at that time? A. Which ones? Q. All the fires there that came down over the hill to the place? A. I don't remember of saying anything. Q. I will ask you whether or not, right at that time, you didn't say to Frank Mensik in the presence of Mrs. Mensik that: 'If we cannot save you, we will back you up'? A. No, sir, I don't remember. Q. You wouldn't say that you didn't say it though? A. I wouldn't say either way, I wouldn't swear to either way."

The cross-examination was certainly proper. An admission against interest by a principal or vice-principal is always competent to be shown, and is not a collateral matter. The rebuttal of his testimony by respondent herself, his attention having been called to

the exact conversation, was also proper and competent. It tended to contradict Walker's version of the conversation. It would even, as to an ordinary witness, be admissible as affecting the weight and value of his testimony. *Sound Timber Co. v. Danaher Lumber Co.*, 112 Wash. 314, 192 Pac. 941; *Sterling v. Radford*, 126 Wash. 372, 218 Pac. 205.

We are unable to find any error justifying reversal. The judgment is therefore affirmed.

MACKINTOSH, C. J., TOLMAN, ASKREN, and MAIN, JJ., concur.